I'm Steve Richard for Vanessa Cattanea. What I'd like to do, I think, because the issues somewhat are pretty well entwined, the jury instructions along with the sufficiency of evidence, I want to talk about both of those sort of all together. I'm going to leave out, at least at this point, the issue of the good faith jury instruction that didn't get into the charge. As far as the trial as against Vanessa Cattanea, the government proved or focused on Ms. Cattanea, you know what the Medicaid rules are and you violated them. That really is the tone tenor in all of the proof that was presented to the jury. Under the instructions as taken in a whole in the charge given to the jury, what that fails to do or what those instructions allowed the jury to do was convict her without showing that she actually willfully committed any scheme to defraud Medicaid. In other words, she was charged with knowing the rules. The instructions also said that the government has to prove she willfully violated the rules. This circuit has indicated that the term willfully reflects or includes or implies that there's bad intent. There's a bad purpose for what she did. In this case, the government had no evidence that there was any bad purpose, at least on the part of Vanessa Cattanea. Clearly had that for co-defendant Hamilton. Well, there was evidence that was submitted that the government points to showing she knew what she was doing and she specifically instructed people not to follow those rules so that people were signing for work that they didn't actually perform and the like. So why wasn't the jury entitled to rely on that and infer bad intent? It would be an inference of bad intent, I suppose, but the approach was she may have instructed or she did instruct how to do things, but she did so in the context of this is how we do things, not that there was a bad purpose. And in fact, the letter from the juror that we submitted for sentencing indicated exactly that. It appears to me, and that's just the one juror, it appears to me that what Ms. Cattanea was doing was simply doing her job to keep her job, not that she was doing anything with any bad purpose or intent. So if that's true, then these instructions under these facts allow the jury to do something that's not right. So is your theory that if someone believes they need to violate the law in order to keep their job, that that's not a bad intent because the ultimate purpose is to keep their job? Is that your position? I'll respond to it this way, that the government has to prove under this statute that Ms. Cattanea or anyone else specifically intended to defraud the government. To do that, there has to be bad intent. And in this case, there simply wasn't sufficient evidence of that. So I think, yes, if you simply violate the rules to keep your job, I don't think that's sufficient to be convicted of specifically intending to defraud Medicare. Well, if you know that in doing this you're violating the regulations, you could know you had to do this to keep your job and decide I'm going to take the risk, but at the same time know that it violates the law. Agreed. So I think the jury could have found that under the instructions which were given. I think that's where the error is, that because there was no specific intent to defraud shown, and in fact the court removed specific intent from the jury instruction that he first drafted, the jury now can do exactly as the court indicates. She can now be convicted of violating the rule even though she had no specific intent to do so. No, I didn't say that. She knew she was violating the rule, but she did it because she knew she had to do it to keep her job. And that's where I think the jury instructions allowed the jury to do that, but I don't think that is sufficient conduct under this statute to be guilty. So the things that she did was to bill inappropriately for the services when they were out on trips. She hired people who were not qualified in the certain categories that would entitle them to the pay that they were paid. This was all in violation of the regulations, and she knew that. No doubt that is what happened. Whether or not she knew all of that was in violation of the regulations, we assume the jury found that to be true. And so what's the difference between that, in your theory, that she knew that she was overbilling Medicaid that is not equivalent to an intent to defraud the government? Maybe that's what I'm missing. What I want to be very careful is she did not do any of the billing. Well, she knew she was preparing documents that were not consistent with Medicaid rule and that those documents were being used for billing or there was evidence submitted that a jury could reasonably find. She was causing internal documents to be prepared to document what was done with the children. Those documents were then submitted or used for submission of billings. She wasn't falsifying the documents, or she wasn't doing the documents with the intent to cheat in any manner. She was simply reflecting what was done, but what was done was wrong. And the jury, with these instructions, found that, it appears to me anyway, found that it doesn't matter if she intended to defraud Medicare, it's just that she knew the rules and she violated the rules. But the instructions, though, were much more specific than that. No, they really weren't. Well, it starts off by saying an intent to defraud is an intent to deceive or cheat. Yes. And initially, the court with that. Why was that an improper instruction under the statute under which she was convicted? Because the statute requires a specific intent to be violated. So you're complaining that it didn't say the government must prove the specific intent to deceive or cheat? In part, that's true, yes. So it's the omission of the word specific. Yes. That renders this, in your view, renders this instruction invalid. Yes. And I couple that with the recklessness part of the instruction, which I know has been approved, but under circumstances that are a little bit different. When the Deering Court approved the reckless conduct, it did so with a set of instructions that had the term specific intent involved in it. The problem we have that I see here is that under this statute, the government has to prove that Ms. Katana specifically intended to defraud the government, but can do so recklessly. That term really pulls out the specific intent. It almost nullifies it. I know the Deering Court says no, but the Deering Court also had an instruction that talked about the specific intent in it, and that justified the finding because of that instruction, along with the bad purpose or bad intent that the other instructions, when we talk about the term willfully, implies. A couple other issues I'd like to hit on, and that would be the severance motion. We filed a motion to sever from Mr. Hamilton early on. The court did not rule on that until, I think, about three weeks before trial, and simply said that we were required to make a threshold showing that co-defendant Hamilton, in fact, would testify. We did not provide, in fact, that he would testify, but I think the Ninth Circuit precedence, as reflected in Kyozo's case, indicates that it's a balancing test that the court needs to go through, not simply a threshold requirement that you have to show that a co-defendant will get on the stand and will say things that would, in fact, incriminate or exculpate a co-defendant. We, in our motion, said we need to have Mr. Hamilton's testimony, and we listed the reasons why. As it comes out, Mr. Hamilton, this is not in the record, he was going to testify all the way along until the end. He refused to testify. We couldn't call him. He's convicted. He talks to the probation department in his pre-sentence report and says precisely what we said he would say, and that was that he was in charge of all the billing and he was the one who approved everything that was done. That clearly was... Why did he refuse to testify? That I don't know. All the way along, he had advised me and his counsel that he would testify. Did you ask him for an affidavit to that effect? Yes. And he wouldn't provide that? He passed away. But did you ask him if he would testify? Beforehand. Did you ask him that if the cases were severed, did you ask him if he would testify in her trial? Yes. And he said yes? Yes. Why didn't you include a declaration to the court to that effect? I probably should have. He had all the way along indicated no matter what would happen, he would testify. It's a little bit inefficient to do two trials unless there's a good reason. Well, in this case, I think there really was. But you'd like to know if you're going to conduct two trials. The reason and that there's some basis that warrants that. I totally agree. But the district court didn't even come close to even looking at it. He simply said there's no showing in fact that he would testify. We can't really show in fact that he would testify because he changed his mind anyway. No, but you could have told the judge that you'd spoken with him and that he indicated that if the two cases were severed, that he was inclined to testify in her trial. I wish we could have. There was no hearing. No, but you could have filed an affidavit. Could have filed an affidavit that he would have said some things and would testify. The flip side of that is as a co-defendant, he would by affidavit incriminate himself. No, in any event. We think it should be the court erred in not allowing the severance and it turns out that Mr. Hamilton's confession, I suppose, to the probation officer directly goes to the very case, the very heart of our case, which we couldn't put on. Last, I'd like to talk about that good faith instruction and I'll save one minute for rebuttal. The court initially included language of good faith in the original instruction number 15. Went back and indicated to us based on the case of Shipsy that he will remove that good faith language because he doesn't have to. In fact, Shipsy had that good faith language in it, the instructions read to the jury in Shipsy. So here's the court now removing good faith from an instruction that was already approved by the circuit, basing the removal on a case in which the language was in the instruction. Without that good faith instruction, again, it skews the proof or the level of proof that the government has a burden to address. We had no specific intent instruction, we had no good faith instruction, and my analysis, the jury and the instructions themselves as a whole allow the jury to convict someone of intentional fraud based on less than proof of intent or fraud. Okay. Thank you. I'll give you a minute for rebuttal. Good morning. May it please the court, my name is Wendy Olson. I'm with the United States Attorney's Office for the District of Idaho, and like Mr. Richard, I was trial counsel at the trial below. I'd like to take up the issues in the order that Mr. Richard raised them here with the court. First, with respect to the jury instructions, it's the government's position that the court's jury instructions were absolutely appropriate in this case. The district court properly instructed the jury with respect to the first element that the defendant was required, we were required to prove that the defendant acted knowingly and willfully, that is with the intent to do something that the law forbids. Second, the second instruction on the element of intent to defraud, the government submits that that instruction was absolutely proper as well, and it defined the intent to defraud as the intent to deceive and cheat, intent to deceive or cheat, which is the language from the model instruction, instruction 3.17 that the Ninth Circuit had at the time. It's the same instruction that this court has upheld previously on the intent to defraud used in many other circuits. So I'd submit that the court was absolutely correct there. Now in his arguments to or objections to the instructions to the district court, the only issue that defense counsel raised was whether the court should include the good faith part of the comment from instruction 3.17. And the district court, and I think properly under this court's precedent, United States v. Shipsy and the other cases that the government cited in its briefing that the court looked at, has repeatedly held that where the court properly instructs on the intent to defraud, no separate good faith instruction is necessary. What's the effect of not having the word specific in the instruction? Your Honor, I think there is no effect of not having the word specific in the instruction. An intent to defraud is a specific intent in and of itself. There are some cases where the court uses specific intent and some where, including the model, where it does not. I think the court told the jury, instructed the jury, you must find that this defendant acted with the intent to defraud. I'm not sure that the word specific adds anything to that, especially where the court goes on to define what the intent to defraud is, an intent to deceive or to cheat. And even so, Your Honors, if the court is concerned about the omission of the word specific, I would submit, as I argued in the brief to the court, that that's an issue that this court is to review for plain error. I submit there's no error, but if it is concerned about it, it's to review it for plain error. In the instructions and the objections to the instructions that were made at the time of trial, the only objection that either trial counsel had was the omission of the good faith instruction. And counsel commented that, yes, it was just the omission of those two sentences that was problematic. And so there was no opportunity for the district court to know that defense counsel found omission of the word specific problematic or that defense language problematic. In his reply brief, defense counsel indicates, well, I did object and said that it simply wasn't a very informative instruction. And I would submit that that's not sufficient. When the court actually looks at that part of the record, at the same time that Mr. Richard is saying that the instruction is not very informative, he's also saying, as he said to this court, he recognized that the language has been approved on, affirmed on appeal before. And federal rule of criminal procedure 30 requires a defendant to make a specific objection to an instruction and state the grounds, therefore, prior to the time the jury retires to deliberate. And that's really to give the court an opportunity to formulate proper instructions. And, again, the only objection here was with respect to not including the good faith language. With respect to the sufficiency of the evidence, Your Honor, I would submit that there was plenty of evidence that this defendant acted knowingly, willfully, and with the specific intent to defraud. The evidence was really undisputed that she had been told by a prior employer about the specific Medicaid rules at issue in this case, that the services billed or, excuse me, delivered away from the facility could not be billed to Medicaid, that persons for this particular kind of service for children, partial care services rather, could not be provided by person with lesser qualifications than being a licensed social worker. So she knew that those were the Medicaid rules. At the time that she was employed by Teton, she herself delivered the services contrary to those rules and directed others to do so. And at the time of all of the activity charged in this case, she was considered the treatment director. She was over all of the facilities that Teton operated, and she gave specific direction to the various individuals who worked for her. Specifically with respect to the American Falls facility, she promoted into a position of authority there a person who herself was not qualified. So you had a program director who was not qualified to provide services directing others who were not qualified to provide services. So I'd submit that she knew exactly what was going on. She knew the rules, and she acted contrary to them. So I think it proves that she acted knowingly and that she acted willfully when she delivered those services contrary to the rule. I submit that there was also evidence that she acted with the intent to defraud. And for that primarily would rely not only on her knowing what she was doing, but on the statement she made to others, the statement she made to Rita Nauman, a counselor when they were providing services away from the facility, and she directed Ms. Nauman not to write down where they were because Medicaid didn't need to know everything. Concealing from Medicaid what they were doing, intent to defraud is a consent to deceive, to conceal, or to cheat. She also, when a Medicaid auditor, Liz Olson, came to the facility told Ms. Olson that the continuing service reports, which were internal documents used in essence as progress notes for these particular kinds of services, she told Ms. Olson that the person who delivered the services also signed the continuing service reports. And there was other testimony that showed that that was simply not true, that Ms. Katana had made a false statement to Ms. Olson. Ms. Katana knew and, in fact, had directed, she knew that the unqualified persons completed the continuing service reports because they provided the service, and that other persons, including herself at times, qualified persons, would sign them. So from looking at those particular documents, Medicaid, and Ms. Olson was a Medicaid auditor, would not know that the services were provided by unqualified staff. And Ms. Katana's misstatement or lie to Ms. Olson, her false statement, made it so that Medicaid at that time would not discover the scheme to defraud by billing for persons provided unqualified services. With respect to the motion to sever, I would submit that this circuit's law is consistent, that there needs to be a showing ahead of time that the testimony will materialize, whether, as the government asserts and the district court asserted, there has to be a showing, in fact, as this court has said in Castro and Hernandez, that the co-defendant will testify, or whether it's what Mr. Richard has described as the broader language from Cuozo, however one would say that case, there has to be a showing at the time that the motion is made that the co-defendant will testify or is likely to testify. In this case … There can never be a guarantee that the person will testify. Right. But there has to be some showing to the court. And as this court has in the record, I believe it's at pages 67 to 69, there was a three-page motion filed by Mr. Richard in this case on behalf of Ms. Katana. And there's one paragraph in the center of that, it's the full paragraph on page 68 of the excerpts of record, where in essence outlines what Ms. Katana would want Mr. Hamilton, her co-defendant, to say. And the language that was used is, Ms. Katana needs the testimony of Brett Hamilton to explain and refute the governmental assertions. And it includes that Mr. Hamilton repeatedly assured her that the programs are operating in compliance with applicable rules. Now, as I think the district court read this, and certainly as I and the government in this case read this, this is not an assertion by any means that Mr. Hamilton would testify at a trial. It's an assertion that there are certain things that Ms. Katana needs him to say. There isn't even a statement that I've talked with Mr. Hamilton, he will testify thus and such. It's just this is what I need him to say. And under any of this court's standards, I would submit or the way they phrase the standard, that's not a showing that he would testify or that he would be likely to testify. He would say, if you recall, this is an assertion of what I would like him to say at a separate trial. And that's what Judge Windmill had before him at the time that he ruled. And when you look at this court's precedence on these cases that we have all cited with respect to the motion for severance, where you need a co-defendant to testify, typically what you have is some sort of an affidavit. That's what there was in the Hernandez case. The one brother had an affidavit from his brother saying he would testify, and the court there said, well, even so you've satisfied the first two parts of the test, but the testimony wouldn't really be favorable. In Mariscal, this court said, even though it came up in the middle of the trial, look, there's no real showing, nothing from the co-defendant saying you would testify. In Castro, the co-defendant was a co-defendant, Cotter, who wanted Castro to testify. The court there found, look, the defendant has said, Mr. Cotter, you said it's likely Castro would testify, but there's nothing indicating that Mr. Castro has offered or agreed to testify. And certainly in this case, there's nothing, it was before Judge Winnell that's in this record that indicates Mr. Hamilton had offered or agreed or was anyway likely to testify, only that Ms. Catano wanted him to do so. So it's a myth that the court certainly did not, that the district court abused its discretion in denying that motion to sever. Lastly, Your Honor, I wanted to address the fourth thing that was raised in the brief. That is the allegation of prosecutorial misconduct in my closing arguments before the district court. You know, this circuit, I think most have held it, in closing argument, a prosecutor is entitled to make fair comment on accurate facts from the record and to make reasonable inferences from those facts. And I would submit that that's precisely what occurred here. The two statements that Mr. Richard led as a prosecutorial misconduct were made during closing argument, the statement that the defendant, Ms. Catano, and Brett agreed they needed to maximize billings and that later on as a separate statement that to achieve her position of treatment director, she agreed with Brett Hamilton that they should maximize billing. Mr. Richard asserts this was a mischaracterization of the evidence. The United States, I disagree. Those were my statements at the closing argument. I would submit that they are a fair statement of what a particular witness, Stephanie Paulson, testified to. Ms. Paulson, in approximately the summer of 2001, was the head of the Pocatello Center for Teton. That was the largest one. Ms. Catano at the time was head of a different center. Ms. Paulson testified that they had monthly program manager meetings and that in those meetings, Mr. Hamilton urged them to maximize, said he wanted them to maximize their billings to Medicaid. Ms. Paulson testified that she disagreed with that, that she thought there should be billings based on the service needs of the children. And then the question was posed to her, what did Ms. Catano say? And her response was Ms. Catano would describe what she was doing to get the maximum number of hours in. Now, I would submit that it is both a fair comment on that testimony and a logical inference that Ms. Catano agreed that they should maximize billing, build a maximum number of hours. Then the statement that she achieved her position as head of essentially all the programs by agreeing to maximize the billings. Ms. Paulson further testified that she was fired a short time thereafter and that one of the comments Mr. Hamilton made to her, the reason for her firing was that the billings were down for her particular center. After that time, Ms. Catano was promoted and made head of all of the centers, including that Pocatello Center where Ms. Paulson had previously been the director. I would submit it's a logical and a fair inference that Ms. Catano achieved her position by agreeing to maximize the billings. On top of that, there was plenty of other evidence that showed that Ms. Catano's, one of her objectives, one of the things she carried out, in essence on Mr. Hamilton's behalf, was to push for increasing billings and to maximize billings. They were submitted as exhibits, and I think they're summarized primarily at pages 22 through 25 of the supplemental excerpts of records. Notes from program manager meetings, the minutes from program manager meetings in which Ms. Catano repeatedly made statements about how to bill to Medicaid and getting maximum number of hours, increasing the billings, get your billings in, for Ms. Catano throughout the time that she worked there, keeping the billings up and increasing the billings was something that she focused on. So there was no prosecutorial misconduct. Thank you, Your Honors. Thank you. You have just a minute. Thank you. The trial testimony primarily entailed or involved former employees of Teton. Of the licensed social workers who testified, I think I asked all but one whether or not they thought the delivery of services was criminal. All of them said no. That, if true, puts us to the position that these instructions allowed a jury to convict someone on a specific intent crime when no one thought the delivery was illegal. The last point I'd like to comment on would be the comments that is also made to the jury in closing about that Hamilton and Catano agreed to defraud Medicare or maximize billings. The loaded issue there is it almost sounds as if they conspired to do so, and there was no testimony of that. There was testimony that she agreed that maximizing billings was an appropriate approach, but not that they schemed together. They agreed to scheme. Okay. Thank you. We appreciate counsel's arguments. The matter will be submitted. We're going to take a short 15-minute break at this time, and we'll be back at that time. All rise.
judges: B. Fletcher, Paez, Ikuta, Cjj